UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS FRANK URBAN,

        Petitioner,

                                      CASE NO. 2:07-CV-15092
v.                                 JUDGE AVERN COHN
                                    MAGISTRATE JUDGE PAUL J. KOMIVES

MARY BERGHUIS,

        Respondent.

_____/

## REPORT AND RECOMMENDATION ON (1) PETITIONER'S HABEAS APPLICATION AND AMENDED HABEAS APPLICATION (docket #1 & #6); and (2) PETITIONER'S MOTION FOR EVIDENTIARY HEARING (docket #14)

*Table of Contents*

I.      RECOMMENDATION ................................................................. 2
II.     REPORT ........................................................................ 2
     A.    *Procedural History* ................................................... 2
     B.    *Factual Background Underlying Petitioner's Conviction* ................. 4
     C.    *Standard of Review* ................................................... 9
     D.    *Failure to Hold Evidentiary Hearing (Claim I)* ....................... 11
     E.    *Prosecutorial Misconduct (Claim III)* ................................ 12
          1.    *Clearly Established Law* ...................................... 12
          2.    *Analysis* ..................................................... 14
               a. Other Acts Evidence ..................................... 14
               b. Gail Urban/Resisting Arrest Testimony ................... 16
               c. Evidence of Petitioner's Silence ........................ 17
               d. Comment that Petitioner was "Paranoid" .................. 20
               e. Misstating Elements of Felonious Assault ................ 21
     F.    *Ineffective Assistance of Counsel (Claim II)* ........................ 23
          1.    *Clearly Established Law* ...................................... 23
          2.    *Analysis* ..................................................... 24
               a. Presumption of Prejudice ................................ 24
               b. Failure to Investigate .................................. 26
               c. Failure to File Motions ................................. 28
               d. Failure to Object ....................................... 28
               e. Failure to Obtain Transcripts ........................... 30
          3.    *Evidentiary Hearing* ......................................... 34
     G.    *Recommendation Regarding Certificate of Appealability* ............... 37
          1.    *Legal Standard* .............................................. 37
          2.    *Analysis* ..................................................... 38
     H.    *Conclusion* .......................................................... 39
III.    NOTICE TO PARTIES REGARDING OBJECTIONS ....................................... 39

I.       RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.      REPORT:

A.       *Procedural History*

1.       Petitioner Thomas Frank Urban is a state prisoner, currently confined at the West Shoreline Correctional Facility in Muskegon, Michigan.

2.       On April 23, 2004, petitioner was convicted of one count of assault with a dangerous weapon, MICH. COMP. LAWS § 750.82, following a jury trial in the Otsego County Circuit Court. Petitioner was acquitted of two counts of resisting arrest and two counts of possessing a firearm during the commission of a felony.  The jury could not reach a verdict on a charge of assault with intent to commit murder and an additional felony-firearm charge.  On June 18, 2004, following a retrial on those charges, petitioner was convicted of assault with intent to commit murder, MICH. COMP. LAWS § 750.83; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.  On July 26, 2004, he was sentenced to a term of 24-48 months' imprisonment on the assault with a dangerous weapon conviction, a term of 180-360 months' imprisonment on the assault with intent to commit murder conviction, and a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.       Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

> URBAN WAS CHARGED WITH ASSAULT-MURDER, RESISTING-OBSTRUCTING, FELONY FIREARM AGAINST POLICE OFFICERS; FELONIOUS ASSAULT AGAINST HIS WIFE.  HIS JURY ACQUITTED ON RESISTING-OBSTRUCTING; HUNG ON ASSAULT-MURDER, FELONY-FIREARM; CONVICTED ON FELONIOUS ASSAULT.  A RE-TRIAL JURY CONVICTED ON ASSAULT-MURDER, FELONY FIREARM.  DEFENSE COUNSEL WAS TOTALLY INEFFECTIVE; THE PROSECUTION EMPLOYED

2

DELIBERATE MISCONDUCT; TRIAL JUDGE FAILED TO CONTROL THE PROCEEDINGS. DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO COUNSEL, DUE PROCESS AND FAIR TRIAL WERE VIOLATED.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Urban* , No. 257728, 2006 WL 2312167 (Mich. Ct. App. Aug. 10, 2006) (per curiam).

      4.     Petitioner, through counsel, sought leave to appeal in the Michigan Supreme Court,

raising the claims that he raised in the Michigan Court of Appeals as well as an additional claim:

URBAN TIMELY FILED A MOTION FOR NEW TRIAL AND LATER AMENDED IT. THE TRIAL COURT DENIED THE AMENDED MOTION. THE ORIGINAL MOTION WAS THEN SUPPLEMENTED AND NOTICED FOR EVIDENTIARY HEARING. THE COURT OF APPEALS CLERK ERRONEOUSLY AND ARBITRARILY CONCLUDED THE ORIGINAL NEW TRIAL MOTION WAS DENIED; AND THEN ADMINISTRATIVELY TERMINATED THE TRIAL COURT PROCEEDINGS. THE CLERK PRECLUDED URBAN FROM RECEIVING AND VIOLATED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO RECEIVE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.

The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Urban*, 477 Mich. 975, 725 N.W.2d 37 (2006).

      5.     Petitioner, through counsel, filed the instant application for a writ of habeas corpus on

November 30. 2007, and an amended petition on July 31, 2008. As set forth in his amended

application, petitioner raises the following claims:

I.     URBAN'S NEW TRIAL MOTION ASSERTED INEFFECTIVE ASSISTANCE OF COUNSEL AND WAS AMENDED TO INCLUDE PROSECUTORIAL MISCONDUCT. THE AMENDED MOTION WAS DENIED. URBAN THEN SUPPLEMENTED HIS ORIGINAL MOTION AND NOTICED IT FOR EVIDENTIARY HEARING. THE COURT OF APPEALS CLERK MISTAKENLY TERMINATED THE LOWER COURT PROCEEDINGS. BOTH APPELLATE COURTS THEN DENIED REMAND, ALL MICHIGAN COURT'S REBUFFED URBAN'S DILIGENT EFFORTS TO OBTAIN AN EVIDENTIARY HEARING, WHICH IN TURN PRECLUDED APPELLATE COUNSEL FROM BEING EFFECTIVE. URBAN'S RIGHTS TO COUNSEL WERE VIOLATED. HE IS ENTITLED TO AN EVIDENTIARY HEARING.

II.    URBAN WAS CHARGED WITH ASSAULT-MURDER, RESISTING-OBSTRUCTING, FELONY FIREARM AGAINST POLICE OFFICERS; AND FELONIOUS ASSAULT AGAINST HIS WIFE.   HIS JURY ACQUITTED ON RESISTING-OBSTRUCTING AND FELONY FIREARM; HUNG ON ASSAULT-MURDER AND FELONY FIREARM; CONVICTED ON FELONIOUS ASSAULT.   A RE-TRIAL JURY CONVICTED ON ASSAULT-MURDER, FELONY FIREARM.  DEFENSE COUNSEL WAS INEFFECTIVE IN NUMEROUS SPECIFIC INSTANCES, WHICH DENIED URBAN A FAIR TRIAL;  DIRECTLY PREJUDICED HIM;  AND, RESULTED IN A VERDICT THAT CANNOT BE RELIED ON.

III.    AT BOTH OF URBAN'S TRIALS, THE PROSECUTOR ENGAGED IN A PATTERN OF DELIBERATE MISCONDUCT THAT VIOLATED URBAN'S FAIR TRIAL RIGHTS AND PROTECTIONS IN A NUMBER OF SPECIFIC INSTANCES.    THE CUMULATIVE EFFECT OF THE PROSECUTOR'S TRANSGRESSORS MANDATE REVERSAL OF URBAN'S CONVICTIONS.

6.    Respondent filed his answer on July 31, 2008.  He contends that petitioner's claims are without merit or procedurally defaulted.

7.    Petitioner filed a motion for evidentiary hearing on September 11, 2009.

B.    *Factual Background Underlying Petitioner's Conviction*

The evidence adduced at petitioner's trials was accurately summarized in the prosecutor's brief in the Michigan Court of Appeals:

Defendant and his wife of 18 years, Gail Urban, lived in a log home built by defendant on a remote piece of property along Old Alba Road outside the City of Gaylord.  (TT II, Vol 2, 119-121).  At the edge of their driveway, a sign warned that defendant would shoot trespassers.  (TT II, Vol 2, 123).  Defendant, who was 60-years-old at the time of the offense, is a retired former mechanic for the City of Detroit.  (TT II, Vol 2, 121).  He was very fit and strong for his age – Gail testified that defendant could lift a transmission out of a vehicle by himself.  (TT II, Vol 2, 120-121).  Defendant did, however, have a hearing problem and wore hearing aides in both ears.  (T II, Vol 2, 157-158).  Defendant had a long history of abusing Gail, both physically and verbally, including threatening to kill her.  (TT II, Vol 2, 119-120).  He had trouble managing his anger, and had no respect for authority figures – particularly police officers – who, he had told Gail, he would shoot if they came near him.  (TT II, Vol 2, 120-122, 124).  Part of this anger stemmed from an incident in Detroit when a Detroit police officer shot and killed defendant's dog, Alex.  (TT II, Vol 2, 122).
        On the morning of September 18, 2003, defendant and Gail arose and planned

4

on reorganizing items in the basement and garage, but defendant became angry with Gail when she brought up the wrong items, and struck her. (TT II, Vol 2, 127-128). They also argued about Gail's alleged drinking, but she had had nothing to drink that day. (TT II, Vol 2, 135). Gail told defendant that that was the last time he was going to hit her, and she then went for a walk. (TT II, Vol 2, 128). When she got back from her walk around two- or three o'clock in the afternoon, defendant was target shooting with his rifle. (TT II, Vol 2, 128). Gail went inside the house and found a note that defendant had written regarding how his dog Alex had been shot and that "he was probably next." (TT II, Vol 2, 125-127, 130). Gail understood the note as meaning that defendant anticipated or intended to shoot any police officers that arrived on the property in response to any call for assistance by Gail. (TT II, Vol 2, 125-126). Later, around five or six o'clock Gail got in the van and attempted to drive away from the house, but defendant stepped in front of the van, pointed his rifle at her, and told her to back the van up or he would shoot the tires and then her. (TT II, Vol 2, 131-132). Gail parked the van, waited for defendant to resume target shooting, and then used a cell phone to call 911 as she ran through the woods towards the road. (TT II, Vol 2, 132-133). She got to the road and a police officer came to pick her up; Gail testified that she told this officer that defendant had a gun, and that she was afraid for her life. (TT II, Vol 2, 134). Gail also warned the officers at the State Police Post when she arrived there that defendant had guns and would likely shoot officers. (TT II, Vol 2, 124, 134-135).

Gail's warnings were seconded by her brother-in-law, Ronald Puzon. Puzon was a summer officer for the City of Gaylord police department, and a former police officer with the Detroit and Ann Arbor police departments. Although defendant did not like authority figures, he and Puzon were friends. (TT II, Vol 2, 240). Gail called Puzon from the State Police Post after she was picked up, and Puzon talked to one of the officers indicating that he thought the police may have some difficulty in resolving the issue with defendant since he was hard of hearing, there was no telephone in the home, he had a rifle, and did not like the police. Puzon advised the police to take precaution in approaching the situation. (TT II, Vol 2, 240-248).

Michigan State Police Trooper Timothy Amburgey was dispatched to defendant's residence on Old Alba Road to respond to a possible domestic assault situation sometime between 6:30 and 7:00 p.m. He arrived at the scene, parked his patrol car, and began surveying defendant's property. He described the property as heavily wooded with pine trees and brush; the house sat back approximately 150-200 yards from the road; he could just see the ends of the U-shaped driveway. Trooper Amburgey made his way up the center of the property between the two ends of the driveway, when he heard shots fired in sets of three, which indicated to him that someone was target shooting. Trooper Amburgey continued to move forward towards the house until he could see defendant moving about shooting targets. He then maintained that position. Because the situation involved a barricaded gunman, the Emergency Support Team had been dispatched to the scene, and when the Emergency Support Team is dispatched, the local police officers' duties are to simply set up and maintain a perimeter – not to initiate contact with the subject – in this case defendant. (T II, Vol 2, 215-221).

5

Another police officer attempted to drive his patrol car up the driveway, but both sides of the driveway had been cordoned off by defendant. Gail testified that defendant had never closed both gates on the driveway before. (TT II, Vol 2, 140). Trooper Amburgey continued to wait in his position as other officers were dispatched to the scene, and set up at various locations on the road around the house. During this time, Trooper Amburgey heard and saw defendant run down his driveway and then back up to the house; defendant entered the house and came back out with his rifle, and Trooper Amburgey heard him rack a shell into the rifle's chamber. (T II, Vol 1, 265-284). Defendant was carrying an M-1 Carbine, which is a short, semi-automatic rifle typically used in short-range combat situations. (T II, Vol 1, 267-268). Trooper Amburgey believed that defendant took these actions in response to seeing one of the patrol cars. (TT II, Vol 1, 265-284).

Trooper Amburgey maintained his position in the woods in front of defendant's home, as it was getting dark he saw defendant enter his home and draw the curtains shut. Later, Trooper Amburgey heard something to his left, and he saw defendant about 25 feet away, smoking a cigarette, carrying his rifle and scope, and starting towards the road. (Gail testified that defendant had never before carried a rifle and handguns with ammunition around the property at night. (TT II, Vol 2, 136).) Defendant then turned and quickly walked into the woods away from Trooper Amburgey, but then came back and went into the house to turn off the light that was on. A few minutes later, in the total darkness, Trooper Amburgey heard a gunshot. (TT II, Vol 1, 285-292). He then heard another police trooper, whom he recognized as Trooper Carlson, shouting commands to defendant to drop the gun, and stating something like "you just shot at me," "you just took a shot at me." (TT II, Vol 1, 293). Trooper Amburgey heard defendant respond by saying "get the fuck off my property." (TT II, Vol 1, 294). Defendant did not follow the commands and Trooper Amburgey heard defendant being tackled by another police officer, who he later identified as Trooper John Hetfield. As Trooper Amburgey ran up to where the incident was taking place, he saw defendant fighting with the officers, and it ultimately took five or six police officers to subdue and handcuff defendant. Trooper Amburgey testified that during the struggle, defendant kept trying to get into the front pocket of his pants, and that after he was handcuffed, he kept trying to get into the back pocket of his pants. The police officers found a loaded handgun in each spot. They also found a large amount of ammunition for each of the weapons. (TT II, Vol 1, 295-302).

Trooper Marv Carlson confirmed that he had been lying on the ground holding his position after the last radio transmission from Trooper Amburgey, which had indicated that defendant had gone into the house to turn off the light, when Trooper Carlson suddenly saw the silhouette of a person appear about 30 feet from his position. (Previously, he had been warned by Gail Urban that defendant would be armed and would attempt to kill officers). The figure was walking towards his position, and Trooper Carlson shouted "don't move;" he then heard the loud crack of a rifle being fired, saw the muzzle flash, and heard a bullet whiz over his head. The shape of the muzzle flash indicated to him that the rifle had been fired in his direction, and not at the ground or in the air. Trooper Carlson remained still and quiet for a moment until he could get his flashlight and rifle trained on the silhouette, which he thought might

6

have been one of the other officers coming to relieve him.  He turned on the flashlight and shouted "State Police, don't shoot, don't shoot."  Trooper Carlson saw that it was defendant and began shouting at him to drop his gun and to get on the ground, and that was when Trooper Hetfield arrived upon the scene and tackled defendant.  Trooper Carlson joined the fight after Trooper Hetfield called for his help, and he struck defendant on the head several times with his flashlight as hard as he could.  He explained that this only seemed to make defendant fight harder.  Trooper Carlson continued to hit defendant, and in the struggle Trooper Carlson's right hand was broken.  Trooper Carlson testified that this was the fiercest fight he had ever encountered in his fifteen years on the force, and that it was clear that defendant had not been trying to get away, rather he had been intent upon physically assaulting the officers.  (TT II, Vol 2, 68-88).

Trooper Hetfield testified that he had been moving towards Trooper Carlson's position on the property to relieve him, when he heard Trooper Carlson say "don't move," and then a second later there was a gunshot, and Trooper Hetfield saw the muzzle flash in front of him and about twelve yards from Trooper Carlson's position.  The flash indicated that the gun had been pointed in the officers' direction, not at the ground or in the air.  Trooper Hetfield heard the bullet fly by his head.  Trooper Carlson then shone the flashlight on defendant who was wearing camouflage clothing and holding the M-1 Carbine rifle at belt level; both officers identified themselves as State Police Troopers and ordered defendant to drop his gun.  Trooper Hetfield testified that after several loud commands, defendant threw his gun to the ground, but he refused to lie down on the ground.  (TT II, Vol 1, 337-352; TT II, Vol 2, 37-38).  Defendant just kept saying "Fuck you.  You're trespassing.  Get off my property."  (TT II, Vol 1, 353).  Trooper Hetfield then tackled defendant, defendant punched him in the nose, and the two began to fight violently.  Trooper Carlson came over and struck defendant on the head with his flashlight, but defendant continued to fight.  (T II, Vol 1, 354-356).  The three continued fighting until the other officers arrived, and helped subdue defendant.  After the officers found the other two handguns, defendant was stripped to his underwear to make sure he did not have any other weapons on his person.  (T II, Vol 2, 6-24).

After defendant was finally subdued and handcuffed, he was taken by ambulance to the local hospital for treatment, along with Troopers Carlson and Hetfield.  Dr. David Hansmann treated defendant and the troopers.  He confirmed that defendant suffered scalp lacerations, abrasions, and contusions, but had no other injuries, was only mildly uncomfortable, was ambulatory and oriented, and voiced no complaints of vision or breathing problems to him.  (TT II, Vol 3, 10-16).  Dr. Hansmann further confirmed that Trooper Carlson suffered a broken finger, and that Trooper Hetfield had facial injuries, including a deviated septum.  (T II, Vol 3, 16).

After the incident, officers searched for the bullet or evidence of its passing.  Trooper Mike Nasser collected a brass casing from a spent bullet near defendant's driveway.  The bullet was never found, although he searched for it and other officers attempted to find it with metal detectors.  (TT II, Vol 2, 201-208).  Detective Sergeant Kevin Day testified that he searched the ground around where the shooting and struggle took place with a metal detector, but did not find the bullet fired from

Defendant's M-1 rifle.  (TT II, Vol 2, 265, 263-264).

Michigan State Police Lab Specialist Steven Hickman tested the M-1 Carbine and determined that the spent casing collected at the scene was, in fact, fired from defendant's rifle.  There was a working safety on the M-1 Carbine.  Hickman also participated in a videotaped live-fire re-creation of the incident.  The recreation was done in between defendant's first and second trial in an effort to help refute defendant's argument that he had accidentally discharged the rifle into the ground near his feet after he was startled by Trooper Carlson's shout of "don't move."  It was also done to support Trooper Carlson's and Hetfield's testimony that the rifle must have been fired from an upright position given their view of the muzzle flash, and the fact that they heard the bullet whiz past their heads.  Hickman fired several shots, one into the ground a little way from his body, and other shots holding the rifle upright, in an effort to recreate what Trooper Carlson witnessed.  The bullet that was fired into the ground was easily recovered with a metal detector, three to four inches below the surface, the bullets from the upright position were not recovered.  (TT II, Vol 2, 224-233).  Detective Day also participated in the shooting reenactment, which was videotaped and shown to the jury.  (TT II, Vol 2, 271-285).

At trial, other than himself, defendant called only one witness, Shirley Henderson.  She knew defendant and Gail from when they used to eat at Henderson's restaurant, and had spent time at their house as a guest.  During those times she never heard defendant make any threatening comments regarding the police.  She testified that Gail would regularly tell her about defendant beating Gail, and that defendant would complain to Henderson about Gail's drinking.  (TT II, Vol 3, 40-47).  On cross-examination, Henderson confirmed that her husband had helped defendant's attorney by talking to a few witnesses, and had also tried to raise some money for defendant's defense.  (TT II, Vol 3, 47-48).

Defendant testified that he did not know that there were police officers on or around his property, and that when he walked down the driveway towards the berm where Trooper Carlson lay concealed, he was only going to check the raspberry patch to see if there were any bears in the patch.  (TT II, Vol 3, 58, 90-93).  According to defendant, he was walking along when he heard someone say something to the effect of "hey, who are you," and that this startled him, causing him to discharge the rifle towards the ground.  (TT II, Vol 3, 93-94).  Defendant then heard what he described as "little boy" voices stating that defendant had shot at them, and defendant announced to the voices that they were trespassing and should leave his property.  Defendant testified that a light was then shown [sic] in his face, and that the voices announced that it was the police and that he should put the gun down.  Defendant's response was: "Fuck you.  Get off the property.  You're trespassin'."  (TT II, Vol 3, 94-97).  According to defendant, he was thereafter tackled and beaten by several police officers, and it was his testimony that he did not resist the officers because he could not see since there was dirt in his eyes and mouth, and he could not hear because his hearing aids were knocked out.  (TT II, Vol 3, 97-100).

Pl.-Appellee's Br. on Appeal, in *People v. Urban*, No. 257728 (Mich. Ct. App.), at 1-9 (footnotes

omitted).

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).  Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539

9

U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.  However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Failure to Hold Evidentiary Hearing (Claim I)*

Petitioner first contends that he was denied a fair appeal and the effective assistance of appellate counsel by the trial court's failure to hold an evidentiary hearing in connection with his motion for new trial and the court of appeals's deciding of the appeal before an evidentiary hearing had been held. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner has cited no caselaw suggesting that a trial court's failure to hold an evidentiary hearing, or an appellate court's failure to allow an evidentiary hearing before deciding an appeal constitutes a denial of due process or effective assistance of appellate counsel. Rather, petitioner cites to cases discussing a habeas petitioner's right to an evidentiary hearing in federal court under 28 U.S.C. § 2254(e)(2). The trial court's failure to hold an evidentiary hearing, even if erroneous under state law, does not entitle petitioner to habeas relief. *See Chaussard v. Fulcomer*, 816 F.2d 925, 932 (3d Cir. 1987); *Edwards v. State of Kansas*, 751 F. Supp. 197, 199 (D. Kan. 1990). While the Michigan Court of Appeals's failure to remand the matter to the trial court may provide a basis for granting an evidentiary hearing in this Court,[1] it did not deprive petitioner of the effective assistance of appellate counsel, the right to meaningful appeal, or any other constitutional right. *See Dowdy v. Sherry*, No. 06-CV-10735, 2008 WL 5188827, at *5 (E.D. Mich. Dec. 10, 2008) (Roberts, J.); *Ezell v. Cason*, No. 1:04-CV-214, 2007 WL 518853, at *7-*8 (W.D. Mich. Feb. 14, 2007); *May v. Renico*, No. 00-10420-BC, 2002 WL 31748845, at *4 (E.D. Mich. Nov. 12, 2002) (Lawson, J.). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Prosecutorial Misconduct (Claim III)*

Petitioner next raises several claims of prosecutorial misconduct. Specifically, he contends

---

[1]Petitioner's motion for an evidentiary hearing is addressed in connection with his ineffective assistance of counsel claims, *infra* part F.

11

that the prosecutor committed misconduct by (1) using impermissible other acts evidence; (2) presenting the testimony of Gail Urban and the police witnesses regarding the resisting arrest charges at the second trial; (3) presenting and commenting on evidence of petitioner's silence; (4) offering a personal opinion that petitioner was "paranoid;" and (5) misstating the elements of felonious assault at the first trial.[2]

     1.     *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of

---

[2]This latter claim was raised in petitioner's direct appeal, and briefly alluded to in petitioner's brief. It is not clear whether petitioner is presenting this prosecutorial misconduct claim here, but for sake of completeness I address it below.

    Further, in his brief in support of his amended petition, petitioner contends that "[t]here are numerous other instances of prosecutorial impropriety." Br. in Supp. of Amend. Pet., at 57. However, it is not the job of a federal habeas court to search the record and ferret out potential prosecutorial misconduct claims. Rather, to be entitled to relief a petitioner must point to specific statements or comments which, alone or together, deprived him of a fair trial. *See Avincola v. Stinson*, 60 F. Supp. 2d 133, 161 (S.D.N.Y. 1999). Accordingly, I address only those matters specifically identified by petitioner.

due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

Many of petitioner's claims, although couched in the language of prosecutorial misconduct, actually attack the admission of evidence at his second trial.[3] It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal

---

[3]A prosecutor does not commit misconduct by introducing admissible evidence or commenting on it during argument. *See Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997); *Hammond v. Michigan Parole Bd.*, No. 04-73385, 2006 WL 2161028, at *16 (E.D. Mich. July 31, 2006) (Roberts, J., adopting Recommendation of Komives, M.J.). As the Sixth Circuit recently explained, "[a] prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008). Thus, to the extent that petitioner's prosecutorial misconduct claims are based on the prosecutor's presentation of evidence that the trial court admitted at trial or the prosecutor's comment on that evidence, the claims are properly analyzed as evidentiary claims rather than prosecutorial misconduct claims.

case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

    2.    *Analysis*

*a. Other Acts Evidence*

Petitioner first contends that he was denied a fair trial by the introduction of, and the prosecutor's comments on, prior bad acts evidence which he contends was barred by MICH. R. EVID. 404(b). Specifically, petitioner contends that the prosecutor committed misconduct by introducing evidence of his prior domestic assaults of his wife. The Michigan Court of Appeals concluded that this evidence was properly admitted in the first trial, because it was relevant to showing petitioner's intent in assaulting his wife, an element of the felonious assault charge. *See Urban*, 2006 WL 2312167, at *2, slip op. at 3. With respect to the second trial, the court of appeals concluded that this evidence was improperly admitted, because petitioner's intent in assaulting his wife was no longer at issue, and the evidence of prior domestic assaults was not probative of petitioner's intent with respect to his assault of the officers. *See id.* at *3, slip op. at 3. However, the court concluded that petitioner was not prejudiced because petitioner's first jury had heard this same evidence and failed

14

to convict petitioner of the assault charges with respect to the officers, and that the verdict in the second trial was likely a result of the video re-creation, which cast significant doubt on petitioner's own testimony.  *See id.*, slip op. at 4.

As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence.  This being the case, petitioner is not entitled to habeas relief even if the evidence was not properly admitted under Rule 404(b).  Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial.  *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974).  To the extent that petitioner contends that this evidence was improperly admitted at the first trial, as the court of appeals explained that evidence was relevant because "[a] past history of threats and abuse makes it more likely that defendant meant to put his wife in apprehension of imminent battery when he pointed a loaded rifle in her direction."  *Urban*, 2006 WL 2312167, at *2, slip op. at 3.  With respect to petitioner's second trial, as the court of appeals explained the evidence of petitioner's prior domestic abuse of his wife was not prejudicial. It was wholly unrelated to the charges at issue in the second trial, and the second jury's verdict is explainable by the video re-creation which cast significant doubt on petitioner's version of events. It is unlikely that the evidence of petitioner's prior abuse of his wife had any impact on the jury, in light of the video re-creation and the officer testimony regarding the shooting incident involving the officers.

Nor does the prosecutor's alleged failure to give sufficient pre-trial notice of this evidence as

15

required by Rule 404(a)(2) provide a basis for habeas relief.  This claim likewise raises solely an issue of state law.  *See Richardson v. Evans*, 99 F. 3d 1150, 1996 WL 603278, * 3 (10th Cir. October 22, 1996); *Doss v. Bock*, No. 00-10030, 2002 WL 1554363, * 13 (E.D. Mich. July 15, 2002) (Lawson, J.) (prosecutor's alleged failure to give prior notice of intent to introduce evidence of defendant's and other witnesses' wrongful acts did not rise to level of a due process violation).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b.  *Gail Urban/Resisting Arrest Testimony*

Petitioner next contends that he was denied a fair trial at the second trial by the prosecutor's presentation of Gail Urban's testimony regarding the assault of her earlier in the day and by the officers' testimony regarding petitioner's resisting arrest.  Petitioner contends that this evidence was not relevant because he had already been convicted of the charge relating to Gail Urban and because he had already been acquitted of the charges relating to resisting arrest.  Contrary to petitioner's argument, however, both sets of testimony were relevant at trial.  Gail Urban's testimony provided context for the police response and explained why the police were at petitioner's property.  Further, her testimony that petitioner did not like the police and was likely lying in wait for an armed showdown with the police was highly relevant to whether petitioner assaulted the police with the intent to kill them, as charged by the prosecutor, or had merely accidentally discharged his gun with no knowledge of the police presence, as claimed by petitioner.  Further, petitioner's resisting of the officers was likewise relevant to his intent.  His continued resistance and attempt to reach handguns concealed on his person was probative of his intent at the time the shot was fired from his rifle, particularly in light of his defense that the discharge was purely accidental and that he did not know the police were on his property.  In these circumstances, the evidence was relevant and the prosecutor did not commit misconduct by introducing the testimony at trial.

*c. Evidence of Petitioner's Silence*

Petitioner next contends that the prosecutor committed misconduct by eliciting evidence about petitioner's silence and commenting on that evidence during closing argument. Petitioner's argument focuses on testimony elicited at trial from the police witnesses, who testified that petitioner did not apologize for the supposed accidental discharge of his gun or otherwise claim that the shooting was accidental. This testimony related to the time following the police surrounding petitioner's house but prior to the time petitioner was tackled and handcuffed. The Michigan Court of Appeals rejected this claim, concluding that because the comments occurred prior to petitioner's arrest and were not attributable to an invocation of petitioner's right to remain silent, his silence was admissible to rebut petitioner's assertion that he never pointed the gun at the troopers and that it accidentally discharged. *See Urban*, 2006 WL 2312167, at *5, slip op. at 5-6. This determination was reasonable.

The Fifth Amendment provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. This provision applies to the states via the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). The Supreme Court has determined that this provision "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). Likewise, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). Nevertheless, the Court's subsequent cases have made clear that *Griffin* and *Doyle* are limited to situations in which the defendant's silence was induced by the governmental assurances embodied in the *Miranda* warnings. *See Fletcher v. Weir*, 455 U.S. 603, 606 (1982) (per curiam) (post-arrest statements made before *Miranda* warnings are given may be commented upon by prosecutor, noting that the Court has

17

"consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him."); *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980) (pre-arrest silence may be used for impeachment because "no governmental action induced [the defendant] to remain silent before arrest.").

It is true that several courts of appeals, including the Sixth Circuit, have held that it violates the Fifth Amendment to use a defendant's pre-arrest silence as substantive evidence of guilt. *See Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2003). However, this is a question on which the courts are equally divided, *see id*. at 282, and, more importantly for purposes of § 2254(d)(1), the Supreme Court has never held that the use as substantive evidence of a defendant's pre-arrest silence not induced by the *Miranda* warnings violates the Fifth Amendment. On the contrary, the Court in *Jenkins* explicitly declined to "consider whether or under what circumstances prearrest silence may be protected by the Fifth Amendment." *Jenkins*, 447 U.S. at 236 n.2; *see also*, *Portuondo v. Agard*, 529 U.S. 61, 70 (2000) (noting *Jenkins* Court's observation that "it was not clear whether the Fifth Amendment protects pre-arrest silence."). As the Supreme Court has explained on several occasions, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009) (internal quotation omitted); *accord Wright v. Van Patten*, 128 S. Ct. 743, 747 (2008). Thus,

> [t]he Supreme Court's failure to rule on this issue, coupled with the "disagreement and confusion" among the federal courts concerning the resolution of this issue, precludes this court from finding that the Michigan Court of Appeals' decision was an unreasonable application of clearly established federal law, where clearly established Supreme Court precedent on the issue of using prearrest silence as substantive evidence of guilt did not, and does not, exist.

*Mitchell v. Lafler*, No. 02-CV-74805, 2003 WL 21817616, at *4 (E.D. Mich. July 10, 2003) (Cohn,

J.) (citing *Worden v. McLemore*, 200 F. Supp. 2d 746, 752-53 (E.D. Mich. 2002)), *aff'd*, 118 Fed. Appx. 24, 27 (6th Cir. 2004); *see also*, *Jones v. Trombley*, 307 Fed. Appx. 931, 934 (6th Cir. 2009). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner contends that he was "in custody" at the time the police surrounded his property, and thus his silence constitutes post-arrest, rather than pre-arrest, silence. This argument is without merit. Although petitioner's property may have been surrounded, at that point petitioner had not been formally placed under arrest nor read his *Miranda* rights. Nor, as far as petitioner was concerned, was his freedom of movement in any way constrained. On the contrary, under petitioner's version of events, he did not even know that the police were on his property, and he thought that the persons present were children trespassing on his property. It is inconceivable that a police presence of which petitioner was unaware could have unfairly induced petitioner's silence. In light of the lack of any clearly established law prohibiting the prosecutor from commenting on a defendant's pre-arrest silence, and in the absence of any facts which suggest that petitioner was in fact in custody at the time of the silences testified to by the officers, petitioner cannot show that he is entitled to habeas relief on this claim.

### d. Comment that Petitioner was "Paranoid"

Petitioner next contends that he was denied a fair trial by the prosecutor's comment that he was "paranoid." During closing argument, the prosecutor argued that the evidence introduced at trial showed that petitioner was "someone who tries to make it something that it's not . . . how his perception of the world is . . . reality is more paranoid than proper perception." Second Trial Tr., Day 3, at 166 (ellipses in original). After explaining that petitioner blamed his wife, the police, and the doctor who examined him for various failings, the prosecutor argued that "[i]t's called paranoia . . . everybody's against me. It makes ya do strange things." *Id*. at 168 (ellipses in original). The Court

19

should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner argues that, through these comments, the prosecutor made a "medical diagnosis for which no expert opinion evidence was introduced; and for which the prosecutor was hardly qualified to opine." Br. in Supp. of Amended Pet., at 57. The record belies this assertion. While "paranoia" constitutes a clinical psychological diagnosis, the terms "paranoia" and "paranoid" are also "in common speech and one can find definitions in abridged dictionaries, not just medical dictionaries or those that are unabridged." *McGlasson v. United States*, 397 F.2d 303, 315 (Ct. Cl. 1968) (Nichols, J., concurring); *see also*, *People v. Uphaus*, 278 Mich. App. 174, 182, 748 N.W.2d 899, 904 (2008) (use of term "paranoid" in presentence report did not deprive defendant of a fair sentencing proceeding where it was clear that the "author used the term 'paranoia' in its colloquial sense."). Here, the prosecutor did not suggest that petitioner had been diagnosed as paranoid in the clinical sense; rather, he argued that the evidence at trial showed that petitioner was distrustful of the police and felt that others were out to get him as a way of explaining petitioner's actions and suggesting that the police officers' testimony was credible even though petitioner's actions, as testified to by the police officers, seemed otherwise inexplicable. In other words, the prosecutor was using the term in its colloquial, rather than clinical, sense, and did not suggest to the jury that any clinical diagnosis had been made. Thus, "[a] review of the context indicates that the prosecutor was not using the term in its technical sense, but in the street sense. The prosecutor related his argument to specific [evidence in the record], and his remarks constituted fair comment on the evidence." *People v. Johnson*, 115 Mich. App. 630, 636, 321 N.W.2d 752, 755 (1982).

Nor did the prosecutor's use of the term "paranoid" constitute an argument based on the prosecutor's personal knowledge. Again, nothing in the prosecutor's comments suggest that the prosecutor knew of a clinical diagnosis of paranoia that had been made with respect to petitioner.

Rather, the context shows that the prosecutor was merely arguing that the evidence adduced at trial showed that petitioner was paranoid in the colloquial sense, and that this paranoia explained petitioner's otherwise inexplicable actions. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### e. Misstating Elements of Felonious Assault

Although it is not entirely clear whether petitioner is raising this claim here, on appeal petitioner also argued that the prosecutor committed misconduct in stating the elements of felonious assault at the first trial. To the extent that petitioner is raising this claim here, the Court should conclude that the claim is without merit.

Under Michigan law "[t]he elements of felonious assault are: (1) an assault, (2) with a dangerous weapon, and (3) with an intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v. Avant*, 235 Mich. App. 499, 505, 597 N.W.2d 864, 869 (1999). During opening argument at the first trial, the prosecutor stated that the evidence would show that petitioner "didn't shoot [Gail Urban] but he threatened her with the gun. . . . She said he pointed it at her, and she believed at that point that he was going to, or would shoot her. That's being put in fear. That's an assault with a dangerous weapon." First Trial Tr., Day 1, at 218. This statement does not actually misstate the elements of the offense. Rather, the statement accurately suggests that petitioner's conduct with respect to his wife constituted an assault with a dangerous weapon, the first two elements of the felonious assault charge. While the prosecutor did not discuss the third element–intent–at this time, petitioner has cited to no case which required the prosecutor to do so. The prosecutor did not state that these were the only two elements, or otherwise suggest that the prosecution need not prove petitioner's intent.

In any event, even if erroneous, petitioner cannot show how the prosecutor's opening

statement description of the felonious assault charge deprived him of a fair trial.  Regardless of whether the opening statement misstated the elements of the felonious assault charge, the prosecutor's closing argument accurately and completely discussed all three elements of the charge.  *See* First Trial Tr., Day 3, at 233-34.  Further, the trial court twice gave the jury complete and accurate instructions on the elements of the felonious assault charge.  *See id.* at 274-75; Day 4, at 5-6.  Here, the prosecutor's alleged misstatement of the law occurred at the beginning of the trial, and was very brief.  Further, it was only marginally damaging at the time it was made because, until the jury was properly instructed on the elements of the crime, it is unlikely that the jury would have, in any event, appreciated the legal niceties concerning the exact elements of the offense.  More importantly, the mistake was subsequently corrected by the prosecutor, defense counsel, and the trial judge, each of whom properly set out the elements of felonious assault just prior to the case going to the jury for deliberation.  In these circumstances, the single, brief misstatement of the elements by the prosecutor did not deny petitioner a fair trial.  *See United States v. Monroe*, 178 F.3d 304, 308 (5th Cir. 1999); *Lingar v. Bowersox*, 176 F.3d 453, 461 (8th Cir. 1999); *United States v. Hodges*, 480 F.2d 229, 234 (10th Cir. 1973); *Russ v. Stegall*, No. 99-CV-73476, 2000 WL 791753, at *3-*4 (E.D. Mich. June 8, 2000) (Cohn, J.).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Ineffective Assistance of Counsel (Claim II)*

Petitioner next claims that his trial counsel rendered constitutionally ineffective assistance in a number of respects.  Specifically, petitioner contends that counsel was ineffective for failing to: (1) investigate petitioner's defense; (2) file any pre-trial or re-trial motions; (3) object to the prosecutor's test shooting re-enactment; (4) obtain transcripts of the first trial for use in the second trial; (5) file a motion in *limine* to exclude evidence of his silence and evidence relating to Gail Urban and his

22

struggle with the police; and (6) object to the admission of other acts evidence. Petitioner also seeks an evidentiary hearing to support these claims. The Court should conclude that petitioner is entitled to neither habeas relief nor an evidentiary hearing.

      1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed  questions of law and fact. *See id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id*.

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable

doubt respecting guilt." *Id*. at 695.

    2.    *Analysis*

*a. Presumption of Prejudice*

Before addressing the merits of petitioner's claim, I address petitioner's assertion that the Court should presume prejudice in analyzing his ineffective assistance claims. Although petitioner does not make a wholesale argument that he is entitled to a presumption of prejudice, he does argue that counsel's handling of the video re-enactment amounted to a constructive denial of counsel warranting a presumption of prejudice. *See* Br. in Supp. of Amended Pet., at 29. With respect to counsel's failure to obtain transcripts of the first trial, petitioner does not expressly argue for a presumption of prejudice, but he does argue that counsel's failure amounted to a failure to subject the prosecution's case to "meaningful adversarial testing," *id*. at 38, and that counsel's "deficient performance . . . , standing alone, merits granting the writ." *Id*. at 39. Similarly, with respect to the evidence regarding Gail Urban and petitioner's resisting arrest admitted at the second trial, he argues that "[c]ounsel's abysmal dereliction of his constitutional duties and obligations . . . in and of itself, warrants an unconditional writ." *Id*. at 47. To the extent that petitioner is arguing that he is entitled to a presumption of prejudice with respect to any of his ineffective assistance claims, the Court should reject this argument.

The Supreme Court has limited the presumed prejudice standard to three types of ineffective assistance claims: (1) complete denial of counsel; (2) government interference with the right to counsel; and (3) conflicts of interest. *See Smith v. Robbins*, 528 U.S. 259, 287 (2000) (citing *Strickland*, 466 U.S. at 692; *United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984)). The Supreme Court has stated that the first category–complete denial of counsel–encompasses both actual and constructive denials of counsel, and that a constructive denial of counsel can occur where "counsel

24

entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. The Supreme Court has recently explained, however, that for an ineffective assistance claim to come within this limited exception to *Strickland*, "the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002). The distinction is between "bad lawyering" and "no lawyering," *Woodard v. Collins*, 898 F.2d 1027, 1028 (5th Cir. 1990); *see also*, *Moss v. Hofbauer*, 286 F.3d 851, 861 (6th Cir. 2002), and the difference is not one of degree, but one of kind, *see Bell*, 535 U.S. at 697.

Here, petitioner has not demonstrated that counsel completely failed to subject to the prosecution's case to meaningful adversarial testing. On the contrary, counsel cross-examined witnesses, presented witnesses on petitioner's behalf, and argued petitioner's theory of the case. *See Moss*, 286 F.3d at 859; *Martin v. Mitchell*, 280 F.3d 594, 613 (6th Cir. 2002); *Cooks v. Ward*, 165 F.3d 1283, 1296 (10th Cir. 1998). All of petitioner's claims are run-of-the-mill pretrial and trial error claims subject to the *Strickland* framework. *See, e.g.*, *Patrasso v. Nelson*, 121 F.3d 297, 300 (7th Cir. 1997); *Gregory v. United States*, 109 F. Supp. 2d 441, 450 (E.D. Va. 2000). In short, "[t]he aspects of counsel's performance challenged by [petitioner] . . . are plainly of the same ilk as other specific attorney errors [the Supreme Court] ha[s] held subject to *Strickland*'s performance and prejudice components." *Bell*, 535 U.S. at 697-98. Accordingly, the Court should conclude that petitioner is not entitled to a presumption of prejudice.

### b. Failure to Investigate

Petitioner first contends that counsel was ineffective for failing to investigate his defense. Specifically, petitioner contends that counsel should have gone to his property and recovered the spent bullet from the ground, which would have shown that petitioner had fired into the ground and not at the officers. The Michigan Court of Appeals rejected this claim, reasoning that petitioner did "not dispute that the police conducted an investigation of the site where the shooting occurred and [did]

not allege that the search was defective or improper in any way.  Hence, on the record before us, we cannot conclude that defendant's trial counsel's investigation would have been anything but cumulative to the police investigation."  *Urban*, 2006 WL 2312167, at *4, slip op. at 5.  The Court should conclude that this determination was reasonable.

Regardless of counsel's performance,[4] petitioner cannot establish prejudice because there is absolutely no reason to believe that a search of the property by counsel would have uncovered the bullet fired from petitioner's gun.  Trooper Nasser testified that he conducted a visual search of the area around where petitioner was standing and was unable to see any bullet on the ground or markings indicating a bullet strike.  *See* Second Trial Tr., Day 2, at 207.  Detective Sergeant Day testified that he searched a wide area around where petitioner was standing at the time of the shot  with a metal detector and found no spent bullet.  He also searched the woods behind where the troopers were located, but found no marks on any trees that indicated a bullet strike.  *See id*. at 263-64.  Petitioner offers no basis to question the police testimony regarding their search, other than to argue that "[t]he bullet had to have been somewhere," and that "[i]t is rank speculation at this time to attempt to identify the location and retrieve the bullet based on the trial record."  Br. in Supp. of Amended Pet., at 25.  While the bullet indeed had to have been "somewhere," that does not mean that it was in some place reasonably discoverable.  The shot was fired in a wooded area, and if it did not strike anything such as a tree during its flight, it could have traveled some distance before falling to the ground.  In any event, finding the bullet anywhere would not have helped petitioner's defense; only finding the

---

[4]I note that it was likely that counsel's "decision not to attempt to recover [the bullet] was reasonable given the circumstances," namely, that the troopers "testified under oath at trial" that the bullet could not be found and that counsel "had no reason to disbelieve [them]."  *Richter v. Hickman*, 521 F.3d 1222, 1234 (9th Cir. 2008), *vacated in part on other grounds*, 578 F.3d 944 (9th Cir. 2009) (en banc). However, because as explained below petitioner cannot establish prejudice, the Court need not rely on this basis in resolving petitioner's claim.

bullet in the ground near where petitioner was standing at the time the shot was fired would have supported his defense that he accidentally discharged the gun into the ground. And if there is "rank speculation," it is in petitioner's assertion that counsel could have discovered a bullet in an area that had already been extensively searched by the police both visually and with a metal detector. Such speculation is insufficient to warrant either an evidentiary hearing or habeas relief.

### c. Failure to File Motions

Petitioner next contends that counsel was ineffective for failing to file pretrial and re-trial motions. To the extent petitioner claims that counsel was ineffective for failing to file various motions to exclude evidence, those issues are addressed in the following subsection. To the extent that petitioner contends that counsel was ineffective simply because counsel failed to file any unspecified pretrial motions, the claim is without merit. A mere failure to file pretrial motions, without more, does not establish that counsel was ineffective. Rather, petitioner must show what motions counsel should have filed and how he was prejudiced by counsel's failure to do so. *See Garnica v. United States*, 361 F. Supp. 2d 724, 735 (E.D. Tenn. 2005); *Williams v. Johnson*, No. 4:00CV453, 2001 WL 671744, at *4 (N.D. Tex. June 12, 2001). Thus, to the extent that petitioner's pretrial motion claim is based on unspecified motions counsel should have filed, and not the particular evidentiary motions discussed below, petitioner's claim is without merit.

### d. Failure to Object

Petitioner next contends that counsel was ineffective for failing to object to, or to seek to exclude, evidence at trial. Specifically, petitioner contends that counsel should have sought to exclude: (1) the post-shooting re-enactment; (2) evidence of his silence; (3) any evidence regarding the allegations involving Gail Urban or his resisting arrest, which were resolved by the jury's verdicts in the first trial; and (4) other acts evidence. The Court should conclude that petitioner is not entitled

to habeas relief on these claims.

With respect to the post-shooting re-enactment evidence, petitioner cannot establish that he was prejudiced because any motion to exclude this evidence would have been without merit. The Michigan Court of Appeals concluded, as a matter of state law, that the video of the re-enactment was admissible as a demonstrative exhibit. *See Urban*, 2006 WL 2312167, at *5, slip op. at 6. In analyzing petitioner's ineffective assistance of counsel claim, this expression of state law is binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). Thus, any objection by counsel to the prosecutor's comments, the other acts evidence, or petitioner's statement would have been futile. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.[5]

---

[5]Petitioner contends that "[c]ounsel's failure to do anything whatsoever to challenge the admissibility (scientific/forensic accuracy and/or reliability; foundational reliability; nature and/or existence of discover materials regarding [the] so-called 're-creation, etc., etc.) . . . beg[s] the admissibility question." Br. in Supp. of Amended Pet., at 26. Perhaps so, but beyond this simple assertion petitioner has failed to make any argument or showing that the re-creation was in fact unreliable, lacked foundation, or suffered from any other deficiency which would have rendered the video inadmissible. Specifically, Lab Specialist Steven Hickman and Sergeant Day testified extensively with respect to the circumstances of the video demonstration, *see* Second Trial Tr., Day 2, at 224-33, 270-85, establishing a foundation for the video. Further, even if the demonstrative exhibit was subject to the requirements of expert scientific testimony under Rule 702, petitioner has made no argument to show that their testimony failed to satisfy the gatekeeping requirements for the admissibility of such evidence under Rule 702. Any question as to the scientific reliability of the results, rather than scientific validity of the test, went to the weight the video was to be accorded by the jury, and not its admissibility. *Cf. Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 n.9 (1993) (distinguishing between scientific reliability and evidentiary reliability, the latter being dependent solely on scientific validity). Because petitioner has pointed to no specific basis upon which counsel could have successfully objected to the admission of this evidence, he is not entitled to habeas relief or an evidentiary hearing.

28

With respect to evidence of petitioner's silence and evidence relating to Gail Urban and petitioner's resisting arrest, as explained above in connection with petitioner's prosecutorial misconduct and evidentiary claims the bulk of this evidence was admissible at trial. Thus, any objection to this evidence at trial would have been futile, and counsel was not ineffective for failing to raise a meritless objection.

With respect to the other acts evidence relating to petitioner's prior domestic assaults of his wife, as noted above the court of appeals concluded that this evidence was inadmissible under Rule 404(b) at the second trial, because this evidence was relevant only to petitioner's intent at the time he assaulted his wife, which was no longer an issue in the second trial. Thus, counsel's failure to object to this evidence may have constituted deficient performance. Nevertheless, petitioner cannot establish that he was prejudiced by counsel's failure to object, because there is not a reasonable probability that the result of the trial would have been different had this evidence not been admitted at petitioner's second trial. As explained in connection with petitioner's substantive claim regarding this evidence, the evidence was wholly unrelated to the charges at issue in the second trial, and the second jury's verdict is explainable by the video re-creation which cast significant doubt on petitioner's version of events. It is unlikely that the evidence of petitioner's prior abuse of his wife had any impact on the jury, in light of the video re-creation and the officer testimony regarding the shooting incident involving the officers. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

*e. Failure to Obtain Transcripts*

Finally, petitioner contends that counsel was ineffective for failing to obtain transcripts of the first trial prior to the second trial. Petitioner contends that such transcripts would have allowed counsel to significantly impeach the testimony of the troopers at the second trial. The Court should

conclude that petitioner is not entitled to habeas relief on this claim.

There is no apparent strategic reason for counsel to have failed to obtain transcripts of the first trial for possible impeachment purposes at the second trial. Thus, counsel's failure to do so likely amounted to deficient performance. *See Blackburn v. Foltz*, 828 F.2d 1177, 1184 (6th Cir. 1987); *Wolfe v. Bock*, 412 F. Supp. 2d 657, 676 (E.D. Mich. 2006) (Lawson, J.). However, to be entitled to relief on this claim petitioner must also establish that counsel's failure to obtain the transcripts resulted in prejudice. *See Robinson v. Jabe*, No. 91-1289, 1992 WL 27017, at *6 (6th Cir. Feb. 13, 1992); *Blackburn*, 828 F.2d at 1184. That is, petitioner must show that counsel's obtaining the transcript would have given counsel impeachment information, and that there is a reasonable probability that, had counsel used this impeachment information, the result of the proceeding would have been different. The Court should conclude that petitioner cannot make this showing.

Petitioner first contends that had counsel obtained a transcript of the first trial he could have impeached the second trial testimony of Troopers Carlson and Hetfield that Trooper Carlson said "you just shot at me" immediately after petitioner fired his gun. At the outset, Trooper Carlson did not testify at the second trial that he made any such statement. Indeed, Trooper Carlson's description of the events immediately preceding and following the firing of the shot was remarkably consistent at both trials and at the preliminary examination. *See* Prelim. Exam. Tr., at 29-30; Second Trial Tr., Day 2, at 70-71.[6] Troopers Hetfield and Amburgey did testify at the second trial that they heard Trooper Carlson yell something to the effect of "you just shot at me" immediately after petitioner fired his gun,

---

[6]The audio tape of Trooper Carlson's direct examination testimony at the first trial was inaudible, and thus there is no transcription of that testimony. At both the preliminary examination and the second trial, Trooper Carlson testified that, immediately after the shot, he yelled "don't shoot, State Police." He also testified that he initially thought that he might have been fired upon by another police officer, who had mistaken him for petitioner.

*see* Second Trial Tr., Day 1, at 293; Day 2, at 13-14, and they gave no testimony to this effect at the first trial, *see* First Trial Tr., Day 1, at 35-36, 280-81.  However, petitioner cannot show a reasonable probability that the result of the proceeding would have been different had Troopers Hetfield and Amburgey been impeached on this basis.  Regardless of whether Trooper Carlson said "you just shot at me," it was clear from Trooper Carlson's testimony that he in fact thought he had been shot at by petitioner, and it was clear that the other troopers also thought that petitioner had fired at Trooper Carlson.  And this belief on the part of the troopers was evident in the testimony of the troopers at both trials.  Regardless of Trooper Carlson's exact words, the troopers were unanimous in their belief that petitioner had fired his gun at Trooper Carlson.  And there is no reason to believe that counsel impeaching the troopers on this point would have caused the jury to so discredit the testimony of all the troopers that it would have reached a different conclusion.  Accordingly, petitioner cannot show that he was prejudiced by counsel's failure to impeach the troopers on this point.

Petitioner next contends that Trooper Hickman could have been impeached because he testified at the second trial that he had attended a two week evidence technician course, while he testified at the first trial that the evidence technician course was a one-week program.  However, Trooper Hickman did not testify as to such a course at either trial.  Rather, Trooper Hickman testified consistently at both trials that he had taken a two year structured training program in firearms, had yearly proficiency tests required for certification in firearms and tool marks, and had taken courses in shooting reconstruction, gunshot residue and distance determination, tool marks, and serial number restoration.  *See* First Trial Tr., Day 2, at 170-71; Second Trial Tr., Day 2, at 224-25.  It appears that petitioner is actually referring to the testimony of another evidence technician, Trooper Michael Nasser.  Trooper Nasser did testify at the second trial that he had taken an evidence technician training course that was two-weeks long, *see* Second Trial Tr., Day 2, at 196, whereas he had testified at the

first trial that the course was a week long course, *see* First Trial Tr., Day 2, at 180. However, petitioner has again failed to provide any reason to believe that impeaching Trooper Nasser on this minor point would have caused the jury to evaluate his testimony any differently. There was no question that Trooper Nasser both was trained as an evidence technician and had served the State Police as a certified evidence technician for several years. No suggestion was made at either trial that Trooper Nasser was not qualified as an evidence technician, and petitioner makes no such suggestion now. Whether the training course lasted one week or two was irrelevant to the substantive issues at trial, and such a minor inconsistency would have had slight, if any, effect on Trooper Nasser's credibility.[7] Accordingly, petitioner cannot show that he was prejudiced by counsel's failure to impeach Trooper Nasser on this basis.

Finally, petitioner contends that counsel should have impeached Trooper Carlson's testimony at the second trial that petitioner could clearly see him when he was shining his flashlight at petitioner. *See* Second Trial Tr., Day 2, at 77, 101-02. This claim has nothing to do with counsel's failure to obtain a copy of the first trial transcript, however, as Trooper Carlson so testified at the first trial as well. *See* First Trial Tr., Day 2, at 20-22. Rather, petitioner contends that counsel should have impeached Trooper Carlson with his preliminary examination testimony, in which Trooper Carlson testified that petitioner could only see the beam of his flashlight. *See* Prelim. Exam. Tr., at 31-32. However, it is not clear that this testimony had significantly impeaching effect. Trooper Carlson was not asked at the preliminary examination whether petitioner could see *him* when he pointed his

---

[7]Indeed, this point was so minor that it is doubtful that counsel would have impeached Trooper Nasser on this point even if he had obtained a copy of the first trial transcript. "It is easy, once a trial is completed, to go back over the transcript with a fine toothed comb and, using 20/20 hindsight, find slightly inaccurate or objectionable testimony. It is much harder to pick up on each and every mistake during the heat of the trial itself." *United States v. Riddick*, 15 F. Supp. 2d 673, 680 (E.D. Pa. 1998).

flashlight at petitioner; rather, Trooper Carlson was asked only whether petitioner could see *his uniform. See id.* at 31.  Trooper Carlson's testimony at the first and second trials was directed at whether petitioner could see him and know that there was a person at whom he was pointing his gun, not whether petitioner could specifically see his police uniform.  There is no question that petitioner knew that someone was there, because Trooper Carlson was yelling at him and holding a flashlight.  And, in any event, Trooper Carlson did not shine his flashlight at petitioner until after the shot had been fired.  The relevant question was what petitioner saw and knew when he fired the shot; that is, whether petitioner shot at someone with the intent to kill that person.  Whether petitioner knew or was able to clearly see who he had fired at after the shot had been fired after the fact was simply irrelevant to petitioner's knowledge and mental state at the time he fired the shot.  In short, while the first trial transcript may have provided counsel with some avenues of impeachment to explore, petitioner has failed to show a reasonable probability that the result of the trial would have been different had counsel done so.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.[8]

    3.    *Evidentiary Hearing*

Petitioner has also moved for an evidentiary hearing to develop evidence in support of his ineffective assistance of counsel claims.  The Court should conclude that such an evidentiary hearing is not necessary.

In addressing whether an evidentiary hearing is appropriate in a habeas corpus case, a court

---

[8]In addition to the matters discussed above, petitioner also makes a general assertion that "[t]he second trial is replete with additional specific examples of lost impeachment opportunities for want of the transcripts." Br. in Supp. of Amended Pet., at 36.  However, it is petitioner's burden to identify the specific deficiencies of counsel and how those deficiencies prejudiced him.  It is not the job of this Court on habeas review to search the transcripts of two trials to identify possible avenues of impeachment that counsel might have been able to develop in the second trial.

must consider two separate issues: (1) is an evidentiary hearing necessary under Rule 8 of the Rules Governing Section 2254 Proceedings in United States District Courts, 28 U.S.C. foll. § 2254; and (2) whether a hearing is permitted under 28 U.S.C. § 2254(e)(2). With respect to the latter issue, an evidentiary hearing is permitted in this case under § 2254(e)(2). That section provides that, "[i]f the applicant has failed to develop the factual basis of the a claim in State court proceedings, the court shall not hold an evidentiary hearing on a claim unless" one of two exceptions is met. 28 U.S.C. § 2254(e)(2). Here, an evidentiary hearing is permissible because petitioner has not "failed to develop the factual basis" of his newly discovered evidence and ineffective assistance claims. In *Michael Williams v. Taylor*, 529 U.S. 420 (2000),[9] the Court explained that Congress' use of the term "'failed to develop' implies some lack of diligence[.]" *Id*. at 430. Thus, "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id*. at 432. Here, petitioner sought an evidentiary hearing on his claims in connection with appeal, but was denied one by the state courts. Thus, he did not fail to develop the factual basis of his claim through some fault of his own. *See Mayes v. Gibson*, 210 F.3d 1284, 1288 n.2 (10th Cir. 2000) (*Michael Williams* standard satisfied where petitioner "raised the need for an evidentiary hearing" on direct appeal and in collateral review proceedings); *Morales v. Coyle*, 98 F. Supp. 2d 849, 893 (N.D. Ohio 2000) (*Michael Williams* standard satisfied where petitioner "sought an evidentiary hearing in state court, which was denied[.]").

---

[9]This case should not be confused with the *Williams v. Taylor* case discussed in part C, *supra*, in which the Court explained the standard of review under § 2254(d). Although both cases bear the same caption and were decided on the same date, the petitioners differed in the two cases. For clarity, I refer to the case discussing § 2254(e)(2) by the petitioner's full name–"Michael Williams"–rather than just by "Williams" as is the ordinary citation convention. *See Watkins v. Miller*, 92 F. Supp. 2d 824, 828 n.1 (S.D. Ind. 2000) (taking same approach).

Nevertheless, the Court should conclude that an evidentiary hearing is not necessary to resolve petitioner's claims. In making the determination of whether an evidentiary hearing is necessary under Rule 8, "courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000) (discussing *Cardwell v. Greene*, 152 F.3d 331, 338 (4th Cir. 1998)); *see also*, *Alcorn v. Smith*, 781 F.2d 58, 59-60 (6th Cir. 1986) (applying pre-AEDPA law); *cf. Townsend v. Sain*, 372 U.S. 293, 312-13 (1963). As the Supreme Court recently explained:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.
> It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing

*Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (citations and footnote omitted). Thus, "'an evidentiary hearing is not required on issues that can be resolved by reference to the state court record.'" *Id.* (quoting *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998)).

Here, an evidentiary hearing would not have the potential to advance petitioner's claims. While an evidentiary hearing could develop evidence outside the record which would bear on whether counsel's performance was deficient, as noted above petitioner cannot establish prejudice with respect to any of his claims even if, as he alleges, counsel's performance was deficient. The prejudice question is resolved by reference to the state court record, and nothing outside the record could bear on that inquiry. Whether petitioner was prejudiced by counsel's failure to challenge various evidence depends on the nature of that evidence and the evidence adduced at trial, as well as the legal determination of whether the evidence was inadmissible. Similarly, whether petitioner was prejudiced

35

by counsel's failure to obtain the first trial transcript is determined solely by the nature of the impeachment information counsel failed to obtain, a question answered by the trial transcripts. In short, with respect to each of petitioner's ineffective assistance claims the prejudice inquiry is resolvable by the state court record, and nothing outside that record could possibly bear on the prejudice inquiry. Because the prejudice prong of the *Strickland* test can be resolved on the basis of the state court record, an evidentiary hearing is not necessary under Rule 8. Accordingly, the Court should deny petitioner's request for an evidentiary hearing.

G.    *Recommendation Regarding Certificate of Appealability*

   1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement

36

to proceed further.”’” *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, “[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable.”  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that “[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.”  Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)’s requirement that any grant of a certificate of appealability “state the specific issue or issues that satisfy the showing required by § 2253(c)(2),” Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain “why a certificate should not issue.”  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

    2.    *Analysis*

If the Court accepts my recommendation regarding the merit of petitioner’s claims, the Court should also deny petitioner a certificate of appealability, for the reasons explained in connection with those claims.  Because it is clear that the failure of the state courts to hold an evidentiary hearing does not present a cognizable constitutional claim, the resolution of petitioner’s first claim is not reasonably debatable.  Further, as explained above, it is clear that the evidence and comments challenged in petitioner’s prosecutorial misconduct claims were admissible or not prejudicial, and thus

the resolution of these claims is not reasonably debatable. Likewise, there is absolutely nothing in the record to suggest that petitioner failed to make comments following the shooting in reliance on a custodial warning of his rights, and it is therefore not debatable that petitioner's pre- and post-arrest silence claims fail to allege a violation of any clearly established federal law that would entitle him to habeas relief. Finally, the resolution of petitioner's ineffective assistance of counsel claims that are derivative of these claims is not reasonably debatable for the same reason that the underlying claims are not reasonably debatable, and the resolution of petitioner's ineffective assistance claim relating to the first trial transcripts is not reasonably debatable because the record establishes that the first trial transcript contained no significant impeachment information which would have created a reasonable probability of a different result. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

H.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will

not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Paul J. Komives                          
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE

Dated: 12/4/09

┌─────────────────────────────────────────────┐
│ The undersigned certifies that a copy of the foregoing │
│ order was served on the attorneys of record   by │
│ electronic means or U.S. Mail on December 4, 2009. │
│                                               │
│                       s/Eddrey Butts          │
│                       Case Manager            │
└─────────────────────────────────────────────┘